**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TAMMY PIERCY,**                                    Case No. 5:18 CV 2214

      Plaintiff,

      v.                                              Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                   MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Tammy Piercy ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 16). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in November 2015, alleging a disability onset date of October 31, 2013. (Tr. 183-84).[1] Her claims were denied initially and upon reconsideration. (Tr. 98, 114). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 127-28). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 14, 2017. (Tr. 28-62). On March 5, 2018, the ALJ found Plaintiff not disabled

---

1. Plaintiff previously filed an application for disability in April 2011, which was denied by an ALJ in October 2013. *See* Tr. 63-82. The application at issue in the instant case alleges disability beginning the day after the first ALJ's decision. *See* Tr. 183.

in a written decision. (Tr. 12-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on September 26, 2018. (Doc. 1).

FACTUAL BACKGROUND[2]

<u>Personal Background and Testimony</u>

Born in 1970, Petitioner was 44 years old on the date of her application, and 47 on the date of the ALJ's decision. *See* Tr. 20, 183. She had a GED and no past relevant work experience. *See* Tr. 20, 36. At the time of the hearing, Plaintiff lived with her husband and six children (ages 22, 18, 17, 14, 11, and 5). (Tr. 34-35). Plaintiff drove, but not far due to numbness in her hands, arms, and shoulders. (Tr. 35).

Plaintiff believed she could not work due to "horrible" pain; the pain was in her back and legs, and she described it as "burning". (Tr. 37). Two to three days per week, it was difficult for her to get out of bed. *Id.*; Tr. 56-57. Medication helped some days more than others, but her back "hurt[] all the time". (Tr. 38). Plaintiff had neck pain that resulted in tingling and numbness down her arms, as well as shooting pain that caused a headache; it affected her ability to use her arms and shoulders. (Tr. 54). Plaintiff was taking Motrin, Percocet, and Flexeril for pain (Tr. 38); she also took Topamax for fibromyalgia, headaches, spasms, and numbness (Tr. 38-39, 50).

Plaintiff saw Dr. Lewis twice per year, and alternately a nurse practitioner in her office twice per year. (Tr. 39). Plaintiff had undergone injections, but her physician told her she might need surgery at some point. (Tr. 40-41). She also tried physical therapy, which sometimes helped, but sometimes "ma[de] another thing worse". (Tr. 41).

---

2. The undersigned summarizes only the evidence related to Plaintiff's arguments – that is, the evidence and testimony regarding Plaintiff's physical conditions, not her mental conditions.

Plaintiff described her fibromyalgia as causing a burning sensation from the back of her knees up to her back, and pain in her entire body; it also caused fatigue. (Tr. 42-43).

Plaintiff stated she could do less at home than previously; her children had to help. (Tr. 45, 49-50). She used a cane to walk, but dropped it at times due to her arm problems. (Tr. 45-46). She used the cane at home, more in the evening, as her pain progressed throughout the day. (Tr. 46). Her pain disrupted her sleep. (Tr. 52).

Plaintiff described a typical day as waking up, waking her children up, showering, sitting on the couch, doing dishes, sometimes making dinner, and sometimes running the sweeper. (Tr. 48-49). She rested and elevated her feet during the day. (Tr. 48-49). Plaintiff's children did the laundry, but she could help fold it at times. (Tr. 51). She only grocery shopped with her children (Tr. 52); she went to church on Sundays (Tr. 53). Plaintiff sometimes dropped dishes as a result of her arm and shoulder pain and numbness; some days she could not brush her hair. (Tr. 55). Plaintiff tried to walk on a treadmill for ten to twenty minutes per day. (Tr. 46-47).

Relevant Medical Evidence

In November 2013, Plaintiff saw Jamesetta Lewis, D.O., at Affinity Medical Pain Center for chronic lower back pain and fibromyalgia. (Tr. 278-81). She reported increasing lower back and right hip pain, gradually worsening over the prior couple of years; she also reported a diagnosis of fibromyalgia. (Tr. 278). Plaintiff reported worsening pain with prolonged standing, lifting, walking, or sitting, as well as arm/hand weakness, and numbness in her legs, arm, and hand. *Id.* Dr. Lewis noted a thoracic spine MRI showed a small distal thoracic syrinx and mild degenerative changes, and a lumbar spine MRI showed multilevel lumbar facet arthropathy, lumbar disk bulges, and a disc protrusion causing a mild area of central spinal stenosis. *Id.*; *see also* Tr. 379 (June 2012 lumbar spine MRI); Tr. 385 (July 2012 thoracic spine MRI). On

examination, Dr. Lewis noted a non-antalgic gait (Tr. 279), spinal tenderness, negative facet loading, and a positive straight leg raise on the left (Tr. 280). Dr. Lewis's impression included chronic low back pain, chronic thoracic pain, chronic opioid dependency, fibromyalgia, and myofascial pain syndrome. *Id*. She prescribed physical therapy and a TENS unit, as well as Cymbalta, tramadol, and ibuprofen. (Tr. 280-81).

In January 2014, Plaintiff reported worsening pain in her neck, back, right hand, and feet. (T. 275). She reported physical therapy helped, but sometimes made her pain slightly worse. *Id*. On examination, Michael Smith, P.A., observed Plaintiff had tenderness to palpation in the cervical and lumbar spine, with spasms in the paraspinal and trapezius muscles. *Id*. Her straight leg test was positive on the left, and she had some decreased sensation in her legs. *Id*. Mr. Smith also noted "multiple positive fibromyalgia tender points noted throughout the examination." *Id*. He assessed, *inter alia*, chronic low back pain, chronic thoracic pain, chronic opioid dependency, fibromyalgia, and myofascial pain syndrome, and continued medications. (Tr. 275-76).

In April 2014, Mr. Smith noted similar physical findings, and made similar assessment; he adjusted Plaintiff's medications to manage her pain. (Tr. 315-16).

In June 2014, Plaintiff saw a family medicine practitioner for a urinary tract infection and lower extremity edema. (Tr. 434). Plaintiff thought her fibromyalgia was not well controlled, and the doctor recommended aquatic therapy. (Tr. 425). That same month, Plaintiff had a normal electromyogram and nerve conduction study. (Tr. 389).

Plaintiff saw Mr. Smith again in August 2014, continuing to complain of pain. (Tr. 351). On examination, she had tenderness to palpation in the lumbar region with spasms in the thoracic and lumbar paraspinal muscles, as well as "multiple positive fibromyalgia tender points". *Id*. Her straight leg raise was negative, and she had full strength, but she had some reduced sensation in

her lower extremities, and tenderness to palpation in her knees. *Id.* Mr. Smith continued Plaintiff's diagnoses and medications. (Tr. 352).

In November 2014, Plaintiff told Dr. Lewis she had pain in her lower back, right shoulder, right knee, upper back, and neck. (Tr. 337). Plaintiff reported a lumbar epidural steroid injection in September 2014 did not provide much benefit, but her TENS unit provided some pain relief. *Id.* Plaintiff had a non-antalgic gait, and was able to rise from seated to standing "with minimal difficulty." (Tr. 337-38). On examination, she had full leg strength, diminished reflexes on the right, tenderness in the paraspinal muscles, positive lumbar facet loading bilaterally, limited lumbar flexion and extension, and a positive straight leg raise on the left. (Tr. 338). Dr. Lewis assessed chronic lower back pain, chronic thoracic pain, chronic opioid dependency, fibromyalgia, and myofascial pain syndrome; she continued Plaintiff's medications, and ordered a bilateral lumbar facet diagnostic block. *Id.*

Plaintiff underwent lumbar facet blocks in January and February 2015. (Tr. 329-30, 343-44). Plaintiff saw Mr. Smith later in February, reporting that the injections did not provide any relief. (Tr. 310). She reported exercising on a treadmill for five minutes per day, and using her TENS unit at least four to five days per week. *Id.* On examination, Mr. Smith noted tenderness to palpation in the lumbar region with lumbar facet loading noted bilaterally, "multiple positive fibromyalgia tender points", spasms in the trapezius and lumbar paraspinal muscles, intact sensation, full strength, and a positive straight leg raise on the left. *Id.* He continued Plaintiff's diagnoses and medications; he also encouraged increased exercise for muscle strengthening and weight loss. (Tr. 311).

In March 2015, Plaintiff saw a family medicine physician to follow up on her edema and urinary tract infection. (Tr. 423). She reported walking for fifteen to twenty minutes per day. *Id.*

On examination, Plaintiff had pitting edema up to her knees. (Tr. 424). The physician advised Plaintiff to elevate her leg while seated, a low sodium diet, and increased water intake; she noted Plaintiff's edema "is likely secondary to body habitus." (Tr. 425).

Mr. Smith noted similar findings at Plaintiff's June 2015 visit as he did in February. *See* Tr. 347-48. He started Plaintiff on a compounding cream. (Tr. 348).

In August 2015, Plaintiff told Dr. Lewis that her pain was eight out of ten, and specifically complained of increasing left knee pain. (Tr. 321). Plaintiff had recently joined a gym and was taking water therapy classes three days per week. *Id.* On examination, Dr. Lewis noted Plaintiff arose from a seated to a standing position "with difficulty" and had an antalgic gait. (Tr. 322). Plaintiff had full motor strength in her legs, and intact sensation. *Id.* She had a positive straight leg raise on the left, "[m]ultiple fibromyalgia tender points", and tenderness at the thoracic and lumbar paraspinal muscle regions with palpation. *Id.* Dr. Lewis continued Plaintiff's diagnoses, including chronic lower back pain, chronic thoracic pain, fibromyalgia, and myofascial pain syndrome; she continued Flexeril and prescribed Percocet. *Id.* Dr. Lewis also discussed weight loss, and possibilities of physical therapy and injections for Plaintiff's knee pain. *Id.*

The following day, Plaintiff went to Aultman Hospital West Immediate Care complaining of back pain. (Tr. 369-70). On examination, she had pain on palpation with some muscle spasm on in the right paraspinal region; her straight leg raise test was negative, and she was diagnosed with an exacerbation of chronic lumbar pain. (Tr. 369).

In October, Plaintiff told Mr. Smith she was exercising at the gym and had lost ten pounds. (Tr. 333). She was using a cane, and requested a prescription for water therapy. *Id.* Plaintiff reported her pain was six out of ten, and on examination, Mr. Smith noted tenderness to

palpation in Plaintiff's cervical, thoracic, and lumbar spine, as well as spasms in her trapezius and paraspinal muscles. *Id.* He again noted "multiple positive fibromyalgia tender points", including "greater than 11 of the 18 points noted on exam." *Id.* Plaintiff had a positive straight leg raise bilaterally and her left knee was tender to palpation, but her strength and sensation was intact. *Id.* Mr. Smith continued Plaintiff's diagnoses and medications, and prescribed a four-prong cane "to help her ambulate better." (Tr. 333-34).

At a psychological consultative examination in December 2015, Plaintiff told the examiner she had been diagnosed with fibromyalgia "by Dr. Fletcher 10 years ago." (Tr. 449). She reported Percocet worked better than tramadol for pain. *Id.* Plaintiff further described daily activities of getting her children up for school, household chores, and cooking dinner. (Tr. 450). Plaintiff's children helped with the household chores, including washing dishes and laundry, but she folded the clothes. *Id.* She drove, and attended church on Sundays. *Id.*

In February 2016, Plaintiff returned to Dr. Lewis at Mercy Pain Medicine regarding back pain, specifically increasing thoracic and cervical pain. (Tr. 647). At that time, Plaintiff was taking Percocet and Flexeril prescribed by Affinity Medical Pain Center. *Id.* Plaintiff described back pain radiating to her neck, shoulders, and legs. *Id.* On examination, Dr. Lewis noted Plaintiff had an antalgic gait, and walked with a cane. (Tr. 649). Plaintiff also had positive lumbar facet loading bilaterally, spasms in her thoracic and lumbar paraspinal muscles, bilateral positive straight leg raise tests, and bilateral knee crepitus; she had full strength in her legs. (Tr. 650). Dr. Lewis further noted eleven out of eighteen fibromyalgia tender points. *Id.* She included a diagnosis of, *inter alia*, fibromyalgia. (Tr. 650-51). Dr. Lewis prescribed medications including Percocet, ibuprofen, and Soma. (Tr. 652-53).

In March 2016, an x-ray of Plaintiff's lumbar spine showed "[m]ild degenerative changes". (Tr. 686). An x-ray of Plaintiff's cervical spine showed degenerative changes "most prominent at C5-C6". (Tr. 687) ("bilateral bony foraminal stenosis at C5-C6, mild on the LEFT, and suspected moderate on the RIGHT").

In May, Plaintiff returned to Mercy Pain Medicine where she saw Jennifer L. Fautas[3] for a reassessment. (Tr. 641). She continued to complain of cervical, thoracic, and lumbar spine pain, which she described as eight out of ten in intensity. *Id.* She reported moderate pain relief from medications, including some symptom relief with the addition of gabapentin. *Id.* On examination, Plaintiff's gait was steady with a cane. (Tr. 643). She had mildly restricted range of motion in her cervical and thoracic spines, and mild-moderately restricted range of motion in her lumbar spine. *Id.* Plaintiff also had mild tenderness to palpation in her spine, but no muscle spasms or trigger points noted. *Id.* Her muscle strength, reflexes, and sensation were normal. *Id.* She had a positive straight leg raising test bilaterally. *Id.* Ms. Fautas noted several diagnoses, including fibromyalgia, chronic pain syndrome, myofascial pain syndrome, cervical spine degenerative disc disease and radiculopathy, and lumbar radiculopathy; she continued medications (Percocet, Flexeril, gabapentin), and ordered spinal MRIs. (Tr. 644-45).

Plaintiff underwent lumbar and cervical spine MRIs in July. (Tr. 654-56). They revealed disk degeneration and moderate disk protrusion in Plaintiff's lumbar spine, as well as mild L5 foraminal stenosis and lateral recess narrowing on both sides around the S1 nerve roots; Plaintiff also had a midline and left paracentral disk protraction at L4-5 resulting in borderline spinal canal stenosis, a syrinx in the conus medullaris, and moderate left paracentral disk protrusion at T10-11 with mild spinal cord compression. (Tr. 654-55). The cervical spine MRI showed

---

3. Although the Commissioner refers to her as "Dr. Fautas" (*see* Doc. 18, at 6), according to other records, Ms. Fautas appears to be a Clinical Nurse Specialist ("CNS"). *See, e.g.,* Tr. 654.

"[m]inimal findings", including "some uncovertebral joint hypertrophy and foraminal stenosis at C5-6 on the left." (Tr. 656).

Plaintiff returned to Ms. Fautas in August. (Tr. 635). She complained of moderate aching pain in her upper and lower back, radiating to her shoulders and neck, and causing numbness in her hands and feet. *Id.* She also reported tingling in her hands and knees, weakness in her arms, and burning in her "whole body". *Id.* The examination revealed similar findings to those from May. *Compare* Tr. 637-38 *with* Tr. 643. Ms. Fautas diagnosed chronic pain syndrome along with thoracic spinal stenosis, disc herniation, disc degeneration, and spondylosis; she also diagnosed lumbar disc herniation, stenosis disc herniation, and radiculopathy. (Tr. 638-39). Ms. Fautas reviewed Plaintiff's MRIs and determined she was a candidate for injections; she continued medications. (Tr. 639). She also noted that "[u]pon discussion, the patient indicates that current treatment results in improved symptom control and ability to perform [activities of daily living]." *Id.*

In March 2017, Plaintiff underwent a thoracic epidural steroid injection with Dr. Lewis. (Tr. 666-67). The following month, Plaintiff told Dr. Lewis she was feeling slightly better since her last visit, but that the March injection provided "no relief due to shingles." (Tr. (Tr. 659). On examination, Dr. Lewis again noted Plaintiff's antalgic gait, and use of a cane. (Tr. 661). Dr. Lewis observed positive lumbar facet loading bilaterally, spasms in the thoracic and lumbar paraspinal muscles, eleven out of eighteen fibromyalgia tender points, full leg muscle strength, a positive straight leg raise bilaterally, and bilateral knee crepitus. (Tr. 662). She listed diagnoses of chronic pain syndrome, myofascial pain syndrome, fibromyalgia, thoracic spinal stenosis and spondylosis, lumbar spinal stenosis and degenerative disc disease, lumbar radiculopathy, cervical spinal stenosis and radiculopathy, and arthropathy of cervical facet and lumbar facet joint. (Tr.

663-64). Dr. Lewis continued Percocet and Flexeril, discontinued gabapentin, and started Topamax. (Tr. 665).

That same month, a family medicine provider noted no tenderness to palpation in Plaintiff's cervical spine. (Tr. 685). She noted Plaintiff's neck pain was likely an exacerbation of a chronic condition; she restarted Plaintiff on gabapentin and referred Plaintiff for physical therapy. *Id.*

In July 2017, Plaintiff returned to Mercy Pain Medicine, seeing Jaime L. DeMarco[4]. (Tr. 678). She complained of pain that was six out of ten in intensity, and had remained the same since her April visit. *Id.* This visit contained the same physical findings, including eleven out of eighteen fibromyalgia tender points. (Tr. 681). Ms. DeMarco assessed thoracic spinal stenosis, thoracic spondylosis, lumbar spinal stenosis, and lumbar degenerative disc disease. *Id.* She prescribed a trial of a compound cream, and continued other medications (including Percocet, Flexeril, and Topamax). (Tr. 682). She again noted Plaintiff's medications resulted in a reduction in pain and improved functioning. *Id.*

In October, Plaintiff returned to Ms. DeMarco (Tr. 672). Plaintiff complained of back pain from the back of her head, down her whole back, into her buttocks; the pain was achy, sharp, and stabbing, and she had numbness, tingling, and weakness. *Id.* On examination, Ms. DeMarco noted identical physical findings to those from the visit with Dr. Lewis in March 2017, including eleven of eighteen fibromyalgia tender points. *Compare* Tr. 662 *with* Tr. 675. Ms. DeMarco added a diagnosis of neck muscle spasms; she also listed diagnoses of thoracic spinal stenosis, thoracic disc degeneration, thoracic spondylosis, lumbar spinal stenosis and degenerative disc disease; she continued Percocet, Flexeril, and Topamax, and started a trial of

---

4 Again, the Commissioner refers to her as "Dr. DeMarco" (*see* Doc. 18, at 7), but the undersigned found no indication in the cited records that she is a medical doctor.

Amitriptyline. (Tr. 675-76). She again noted Plaintiff reported pain reduction and improved functioning with medications. (Tr. 676).

Throughout Plaintiff's records she is noted to be obese. *See* Tr. 275, 279, 310, 315, 338, 347, 351, 450, 637, 643, 650.

*Opinion Evidence*

In November 2014, Dr. Lewis completed a physical residual functional capacity form in which she opined Plaintiff could: lift ten pounds occasionally[5], lift less than ten pounds frequently[6], stand/walk for less than two hours in an eight-hour workday, and sit less than two hours in an eight-hour workday. (Tr. 360). She opined Plaintiff needed to periodically alternate sitting, standing, or walking, and could only sit or stand for five minutes before needing to change position; she also needed to shift positions at will from sitting or standing/walking. *Id.* Dr. Lewis also opined that Plaintiff would need to lie down at unpredictable intervals, explaining: "Pt suffers from lower back pain due to disk protrusion [and] spinal stenosis . . ." and that "[l]ying down intermittently with stretching across the area" would be necessary. *Id.* Dr. Lewis also opined Plaintiff could reach frequently, and push/pull less than occasionally, but had no limitations in handling, fingering, or feeling. (Tr. 361). Finally, she opined Plaintiff would miss work more than three times per month. *Id.* She cited July and August 2012 MRIs as the medical findings in support of these restrictions. *Id.*

In December 2015, State agency physician Leon Hughes, M.D., reviewed Plaintiff's records. (Tr. 86-96). He opined Plaintiff could perform the lifting and carrying requirements of light work (twenty pounds occasionally and ten pounds frequently), and could sit, or stand/walk for about six hours each in an eight-hour workday; she had some postural limitations. (Tr. 91-

---

5. The form defined "occasional" as "no more than 1/3 of an 8 hr day". (Tr. 360).
6. The form defined "frequent" as "1/3 to 2/3 of an 8 hr day". (Tr. 360).

93). He specifically cited obesity, fibromyalgia, and degenerative disc disease as the reasons for the postural limitations. (Tr. 92-93).

In April 2016, State agency physician Indira Jasti, M.D., reviewed Plaintiff's records. (Tr. 107-09). She affirmed Dr. Hughes' opinion that Plaintiff could perform the lifting and carrying requirements of light work, but limited Plaintiff to stand/walk for four hours per day. (Tr. 107). She also added postural limitations, based on "obesity, fibromyalgia and mild deg[enerative] changes in [cervical] spine, [lumbar] spine and also [k]nees." (Tr. 108). Finally, she added an environmental limitation that Plaintiff avoid all exposure to hazards due to obesity and degenerative changes. (Tr. 109).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 58-61). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 59). The VE responded that such an individual could perform jobs such as order clerk, document preparer, and weight tester. *Id.* The VE also testified that use of a cane to ambulate or the need to shift position between sitting and standing twice per hour for two to three minutes at a time would allow for the same jobs. (Tr. 59-60). Finally, the VE testified that a person could not be off-task more than ten percent of the workday or absent more than two days per month. (Tr. 60). In response to a question from Plaintiff's counsel, the VE testified that adding limitations to occasional reaching and handling bilaterally would preclude employment. (Tr. 60-61).

ALJ Decision

In his March 5, 2018 written decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 15). He determined Plaintiff had

severe impairments of obesity and degenerative disc disease of the lumbar, thoracic, and cervical spine; none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment. (Tr. 15-17). The ALJ specifically determined that fibromyalgia was not a medically determinable impairment. (Tr. 15). The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except [t]he claimant can climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; balance, stoop, kneel, and crouch occasionally; and never crawl. The claimant can never work at unprotected heights, never with moving mechanical parts, and never operate a motor vehicle at work.

(Tr. 17). The ALJ found Plaintiff had no past relevant work, but given her age, education, and work experience, there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 20-21). Therefore, the ALJ found Plaintiff not disabled. (Tr. 21-22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

14

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises three related objections to the ALJ's decision. First, she contends the ALJ erred in finding fibromyalgia not a medically determinable impairment at Step Two. Second and third, she contends that the ALJ's first error led him to err in his evaluation of Plaintiff's subjective symptoms, and evaluation of treating physician Dr. Lewis's opinion. For the reasons discussed below, the undersigned finds no error and affirms.

Step Two: Fibromyalgia

At Step Two, an ALJ must identify a claimant's "severe" medically determinable impairments. *See* 20 C.F.R. § 416.920. As noted above, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

Consideration of whether a claimant's fibromyalgia qualifies as a "medically determinable impairment", that is, one which can be the basis for a disability finding under 42 U.S.C. § 423(d)(1)(A), is governed by SSR 12-2p, 2012 WL 3104869. Under SSR 12-2p, the ALJ cannot rely on a physician's diagnosis alone; rather, the evidence must document that the physician reviewed the person's medical history and conducted a physical exam. 2012 WL 3104869, at *2. Further, to ensure that "there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity[,]" the ALJ must apply at least one of the following: (1) the 1990 American College of Rheumatology ("ACR") Criteria for

15

Classification of Fibromyalgia; or (2) the 2010 ACR Preliminary Diagnostic Criteria. *Id.* Under the 1990 ACR criteria, fibromyalgia is a medically determinable impairment if the claimant has: (1) a history of widespread pain in all quadrants of the body for at least three months; (2) at least eleven positive tender points found bilaterally on the left and right sides of the body on physical examination; and (3) evidence that other disorders that could cause the symptoms were excluded. *Id.* at *2-3. Under the 2010 ACR criteria, fibromyalgia is a medically determinable impairment where the claimant has (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms or signs, such as fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause the symptoms were excluded. *Id.* at *3. In sum, both tests require a Plaintiff to show "evidence that other disorders that could cause the symptoms were excluded." *Id.* at *2-3.

The ALJ explained his consideration of Plaintiff's fibromyalgia diagnosis at Step Two, specifically, that he found it not to be a "medically determinable impairment":

> Pain Management records note a diagnosis of fibromyalgia, but it does not meet the full SSR 12-2p criteria. SSR 12-2p notes that symptoms alone do not establish the impairment. To be a medically determinable impairment, there [must] be a diagnosis by a licensed physician, who reviewed the claimant's medical history and conducted a physical exam. There must also be a three month history of widespread pain in all 4 quadrants and axial skeletal pain, with 11 of 18 positive tender points present bilaterally OR repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions as listed in the SSR, as well as evidence that other reasons for symptoms or signs were excluded. Tender points are noted in April, July and October 2017, but none were noted in May and August 2016 (B12F/5, 11; B13F/5; B14F/5, 11). It is unclear whether the examinations in April, July, and October were new examinations or whether they were just the findings from prior records, as they are all identical and no specific tender points are identified. *There is not sufficient evidence that other reasons for symptoms or signs were excluded, given her degenerative disc disease and obesity. Therefore, fibromyalgia is not a medically determinable impairment.*

(Tr. 15) (emphasis added).

This finding is supported by substantial evidence. Although there is certainly evidence in the record of tender points and widespread pain (as required by the 2010 ACR criteria), Plaintiff points to no evidence discussing the reasoning behind the fibromyalgia diagnosis, or, most importantly (to address the ALJ's reasoning), any evidence that other diagnoses were ruled out as the cause of her symptoms. As the SSR explains, regarding the evidentiary requirement to rule out other disorders:

> Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from FM. Therefore, it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).

SSR 12-2p, 2012 WL 3104869, at *3 (footnote omitted). Failure to present such evidence is a valid basis for an ALJ to find fibromyalgia not medically determinable. *See, e.g., Bouza v. Colvin*, 2017 WL 3622670, at *3 (E.D. Mich.) ("Bouza calls the ALJ's reliance of the lack of evidence that other conditions were ruled out 'unsupported and absurd', but the fact is that each SSR 12-2p requirement must be satisfied to establish fibromyalgia as a medically determinable impairment.") (record citation omitted); *Reavis v. Colvin.*, 2016 WL 6600496, at *4 (E.D. Ky.) ("Fibromyalgia can be established if a claimant has all three of the following" including "evidence that other disorders that could cause the same symptoms were excluded."); *Walters v. Comm'r of Soc. Sec.*, 2015 WL 1851451, at *8 (S.D. Ohio) ("[T]here is no indication in the record that her treating physicians ever performed testing to rule out other disorders that could be causing plaintiff's symptoms so as to satisfy the required third prong of §§ II.A. and II.B. Thus, the ALJ reasonably determined that §§ II.A.3 and II.B.3 were not satisfied in this case."), *report and recommendation adopted*, 2015 WL 5693640.

Instead of pointing to such evidence, Plaintiff argues the ALJ legally erred "by not adopting the prior ALJ's determination fibromyalgia is a severe medical impairment." (Doc. 13, at 8). She cites *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997) and *Denard v. Secretary of Health & Human Services*, 907 F.2d 98 (6th Cir. 1990), arguing that "[a]s fibromyalgia was already determined to be a severe impairment in the last ALJ decision and there is no evidence or indication that this condition has improved or resolved, this finding was binding on [the ALJ in the instant case]." (Doc. 13, at 8). Plaintiff points to Dr. Lewis's diagnosis of fibromyalgia, accompanied by her physical examinations and notations of tender points. *Id.* at 9.

By way of brief background, the undersigned notes that in *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997); *Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. 2015). In that case, the claimant's initial claim for SSI was denied when an ALJ found that the claimant retained an RFC for sedentary work. *Drummond*, 126 F.3d. at 838. When the claimant later re-filed her disability claim, a second ALJ found that the claimant retained an RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839. After explaining that "[r]es judicata applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the claimant's condition. *Id.* at 841-42. "Just as a social security claimant is

barred from relitigating an issue that has been previously determined, so is the Commissioner."

*Id.*

In response to *Drummond*, the Social Security Administration promulgated Acquiescence

Ruling 98–4(6), which explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3 (footnote omitted).

More recently, the Sixth Circuit clarified the scope of *Drummond* and *Denard* in *Earley*

*v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018). In *Earley*, the Sixth Circuit

clarified that *res judicata* applies to subsequent applications for "the same period of time [ ]

rejected by the first application." *Id.* at 933. The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." *Id.* at 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.
>
> All of this helps to explain why *Drummond* referred to "principles of *res judicata*" – with an accent on the word "principles." 126 F.3d at 841-843. What

are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842, *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Id.*

The ALJ decision in this case was issued on March 5, 2018 (Tr. 22), prior to the Sixth Circuit's determination in *Earley* on June 27, 2018, *see* 893 F.3d 929. However, the ALJ cited *Drummond* and explained: "The claimant submitted new evidence, which shows a new and material change in circumstances beginning October 1, 2015. As such, I am not bound by the findings of the previous ALJ as of that date." (Tr. 12-13). The prior ALJ decision, from October 2013, listed fibromyalgia as one of Plaintiff's severe impairments without discussion of SSR 12-2p. *See* Tr. 68.[7]

As the Sixth Circuit explained in *Earley*, "it is fair for an [ALJ] to take the view that, absent new and additional evidence, the first [ALJ]'s findings are legitimate, *albeit not binding*, consideration in reviewing a second application." 893 F.3d at 931 (emphasis added). Thus, preliminarily, the ALJ was not "bound" by the prior ALJ's decision finding fibromyalgia to be a severe impairment. The Sixth Circuit further explained:

The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications—apply to individuals *and* the government. At the same time, they do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.

---

7. That decision ultimately found Plaintiff capable of a full range of sedentary work, *see* Tr. 69, as compared to the current ALJ's finding that Plaintiff was more limited posturally and environmentally, *see* Tr. 17.

*Id.* The ALJ here did just that – gave the evidence relating to Plaintiff's new application, for a new time period, a "fresh look". After finding that there was new evidence and he was not bound by the prior ALJ's determination, the ALJ explained that Plaintiff had not shown fibromyalgia to be a medically determinable impairment pursuant to SSR 12-2p. As discussed above, that evaluation was supported by substantial evidence. For these reasons, the undersigned finds no error in the ALJ's finding that fibromyalgia was not a medically determinable impairment, despite the prior ALJ's finding that it was a severe impairment.[8]

Subjective Symptom Analysis / Credibility

Plaintiff also argues the ALJ erred in his subjective symptom / credibility analysis "particularly in the context of the diagnosis of fibromyalgia[.]" (Doc. 13, at 9). Again, the undersigned finds no error.

The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 416.929(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800–01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the

_____

8. The undersigned also agrees with the Commissioner that the prior ALJ's decision finding fibromyalgia a severe impairment "was not explained or persuasive." (Doc. 18, at 13). The prior ALJ did not, as SSR 12-2p requires, address whether other impairments were ruled out as the cause of Plaintiff's symptoms. *See* Tr. 68. This provides further support for the ALJ's decision to deviate from the prior ALJ's decision.

severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

When a claimant alleges impairment-related symptoms, an ALJ must follow a two-step process to evaluate those symptoms. 20 C.F.R. § 416.929; SSR 16-3p, 2017 WL 5180304, *2-8.[9] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 416.929(c)(3). *Id.* at *7-8. Those factors include: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

---

9. SSR 16-3p replaced SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13.

The Sixth Circuit has explained (interpreting SSR 96-7p, the precursor ruling), that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such determinations are "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]."). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ in this case cited (Tr. 18) and then followed the above-described two-step process (Tr. 18-19), and the undersigned finds no "compelling reason", *Smith*, 307 F.3d at 379, to disturb his subjective symptom evaluation. The ALJ explained:

> As for the claimant's statements about the intensity, persistence, and limiting effects of . . . her symptoms, they are inconsistent because, other than a single thoracic epidural steroid injection, the records do not indicate any significant treatment other than medications since that application date. While she does have ongoing pain, it has been treated conservatively, and the records demonstrate that she reported a reduction in pain and an improved level of functioning with activities of daily living, and she denied any significant adverse effects (B14F/6,12). Treatment history, diagnostic and clinical findings, and the claimant's activities of daily living all support the above residual functional capacity.

(Tr. 18).

At the outset, Plaintiff is correct that subjective symptoms analyses take on particular significance in cases involving fibromyalgia. *See Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (cases involving fibromyalgia "place[] a premium . . . on the

assessment of the claimant's credibility."); *see also Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988) ("[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) ("[U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."); *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) ("[T]he ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of fibromyalgia.").

As noted *supra*, however, the ALJ's decision to find fibromyalgia not a medically determinable impairment is supported. Moreover, contrary to Plaintiff's argument (Doc. 13, at 10), the ALJ applied the appropriate factors in assessing Plaintiff's subjective symptoms. First, he noted no "significant treatment other than medications" and that her ongoing pain had been "treated conservatively". (Tr. 18). Conservative treatment is a valid consideration in assessing a claimant's subjective symptoms. *See Tweedle v. Comm'r of Soc. Sec.,* 731 F. App'x 506, 508 (6th Cir. 2018) ("[T]he ALJ appropriately considered Tweedle's conservative treatment history in discounting his claim of disabling pain."); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (ALJ appropriately considered conservative treatment when discounting a treating source opinion); *see also Hauser v. Comm'r of Soc. Sec.*, 2014 WL 48554, at *9 (S.D. Ohio) ("In terms of medical care, it is proper to classify taking prescription medications and receiving injections as 'conservative' treatment."); *Dinkins v. Comm'r of Soc. Sec.*, 2014 WL

1270587, at *11 (N.D. Ohio) (classifying as "conservative" treatment measures including narcotic pain relievers, anti-inflammatory medications, and neurological medications).

Second, the ALJ also specifically noted a gap in treatment between August 2016 and March[10] 2017. *See* Tr. 18-19. Additionally, the ALJ noted Plaintiff was scheduled for another thoracic epidural injection, but there are no records it was completed, and that she was referred to physical therapy in April 2017, but there is no indication she attended. (Tr. 19) (citing Tr. 659). A lack of treatment is also a legitimate reason on which the Commissioner may rely to discount credibility. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir. 2013) (minimal treatment or lack of treatment is valid reason to discount severity and credibility); *see also Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."); *Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012) (ALJ appropriately discounted a treating source opinion in part based on gaps in treatment); SSR 16-3p, 2017 WL 5180304, at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . we may find the alleged intensity and persistence of an individual's symptoms inconsistent with the overall evidence of record.").

Third, the ALJ noted Plaintiff herself reported a reduction in pain and improved functioning in her activities of daily living. (Tr. 18-19). This is accurate. As the ALJ cited, and elsewhere, numerous records note Plaintiff reported pain relief from her medications and that her

---

10. Although the ALJ stated Plaintiff had a "gap in treatment from August 2016 until April 2017", *see* Tr. 18-19, he also correctly noted that she received a thoracic epidural steroid injection in March 2017 (Tr. 19). Either way, there is a significant gap.

medication helped her perform her activities of daily living. *See* Tr. 333 (October 2015 – "She is currently using Percocet, Flexeril, and ibuprofen, and states that the medications do help control her pain without any side effects. She states that she is continuing to try to go to the gym as often as she can to help with her weight and has been able to lose 10 pound[s] since her last office visit."); Tr. 641 (May 2016 – "[Plaintiff] report[ed] moderate[] pain relief from her present analgesic therapy. She denies any adverse effects. She did notice some symptom relief with the addition of gabapentin."); Tr. 639 (August 2016 – "Upon discussion, the patient indicates that current treatment results in improved symptom control and ability to perform [activities of daily living]"); Tr. 659 (April 2017 – "Upon discussion, the patient indicates that current treatment results in improved symptom control and ability to perform [activities of daily living]. . . She is slightly better than her last visit. . . She has been taking Flexeril with some relief."); Tr. 682 (July 2017 – "The patient reports a reduction in pain and an improved level of functioning with activities of daily living, denies any significant advers[e] effects[.]"); Tr. 672 (October 2017 – "The patient is currently prescribed [P]ercocet, [F]lexeril, compound cream, lactulose and [T]opamax from our office . . . The medications are effective.").

Finally, at another point in his decision, the ALJ noted that "[t]reatment history, diagnostic and clinical findings, and the claimant's activities of daily living all support the above residual functional capacity." (Tr. 18). Earlier in his decision, the ALJ described Plaintiff's daily activities as including driving, preparing meals, watching television, and attending church; he also noted her report of an ability to handle her own self-care, as well as caring for children and pets. (Tr. 16). This is supported by Plaintiff's testimony and reports to physicians. *See* Tr. 449-50 (December 2015 report consultative examiner); Tr. 48-58 (hearing testimony). Although Plaintiff certainly reported she had difficulty with some activities, medical records also frequently note an

improvement in her ability to attend to activities of daily living. *See* Tr. 639, 645, 659, 682. And, it is certainly worth noting that the ALJ accommodated Plaintiff's complaints of pain to a significant degree, limiting her to less than a full range of sedentary work in the RFC. (Tr. 17); *see also* Tr. 19 (finding Plaintiff's impairments of degenerative disc disease and obesity support a restriction to sedentary exertion in contrast to the State agency physicians' opinions of light work).

The ALJ's decision thus addresses the regulatory factors of daily activities, treatment received, efficacy of treatment, and side effects. 20 C.F.R. § 416.929(c). His reasoning is supported by substantial evidence and thus must be affirmed. *See Ulman*, 693 F.3d at 713-14.

Treating Physician Opinion

Finally, Plaintiff argues the ALJ erred in his evaluation of Dr. Lewis's opinion. Again, Plaintiff's argument is based in large part on an assumption of an underlying medically determinable impairment of fibromyalgia. For many of the same reasons described above, the undersigned finds no error.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[11] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to

---

11. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in November 2015 and thus the previous regulations apply.

give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

At the outset, the undersigned notes that despite Plaintiff's primary argument that the ALJ erred in his evaluation of Dr. Lewis's opinion because he failed to adequately consider it within the context of fibromyalgia, Dr. Lewis *herself* did not cite fibromyalgia anywhere in her opinion as the basis for her opined limitations. *See* Tr. 360-61. In response to a question asking her to "indicate what medical findings support the above-mentioned restrictions", Dr. Lewis only referenced July and August 2012 MRIs. (Tr. 361). The only other written explanation accompanying the opinion is Dr. Lewis's note that Plaintiff would need to lie down during a

workday because she "suffers from lower back pain due to disc protrusion [and] spinal stenosis " and that "[l]ying down intermittently and stretching across the area" would be necessary. (Tr. 360). Again, thus, the basis for the cited restriction is only Plaintiff's back problems.[12]

To repeat from above, Dr. Lewis opined that Plaintiff could only sit for less than two hours (and only five minutes before needing to change position) and stand/walk for less than two hours (and only five minutes before needing to change position). (Tr. 360). She also opined Plaintiff would miss more than three days of work per month due to symptoms or treatment. (Tr. 361). The undersigned finds the ALJ satisfied the "good reasons" requirement in his discussion of Dr. Lewis' opinion:

> The opinion of Jamesetta Lewis of less than sedentary exertion at B3F . . . is given little weight as there is no support for such extreme limitations, including an ability to sit less than two hours in an eight-hour day and for only five minutes at a time, nor is there support for excessive absences. While she does have ongoing back pain, her pain medications allow her to maintain her activities of daily living, which are consistent with an ability to perform a range of sedentary exertion work.

(Tr. 20).

The ALJ's explanation implicates both the consistency and supportability factors under the regulations. First, the ALJ stated that "there is no support for such extreme limitations". (Tr. 20). Under there regulations, "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. § 416.927(c)(3). The Sixth Circuit has explained that "administrative law judges may properly give little weight to a treating physicians' check-off form of functional limitations that did not cite clinical test results, observations or other objective

---

12. For this reason, and because the ALJ's decision to find fibromyalgia not a medically determinable impairment is supported by substantial evidence, the cases cited by Plaintiff – which rely on an underlying medically determinable fibromyalgia impairment – are distinguishable. *See* Doc. 13, at 12-14.

findings." *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) (internal citation and quotation omitted). The *Ellars* court collected cases, stating: "These cases recognize that the administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence." *Id.*

Dr. Lewis's form offers little explanation of the basis for her opined restrictions and cites only 2012 MRIs in support. *See* Tr. 361. Elsewhere in his opinion, the ALJ discussed more recent imaging. *See* Tr. 18-19. Specifically, he cited Plaintiff's March 2016 cervical and lumbar spine x-rays (Tr. 18 (citing, *inter alia*, Tr. 686-87), and July 2016 lumbar and cervical spine MRIs (Tr. 19) (citing 654-56). The lumbar x-ray revealed "mild degenerative changes" (Tr. 686), and the cervical spine x-ray showed "bilateral bony foraminal stenosis at C5-C6, mild on the LEFT, and suspected moderate on the RIGHT" (Tr. 687). The lumbar spine MRI revealed disk degeneration and moderate disk protrusion, mild foraminal stenosis and lateral recess narrowing, a midline and left central disk protraction resulting in borderline spinal canal stenosis, a syrinx in the conus medullaris, and moderate left paracentral disk protrusion at T10-11 with mild spinal cord compression. (Tr. 654-66). The cervical spine MRI showed "[m]inimal findings", including "some uncovertebral joint hypertrophy and foraminal stenosis at C5-6 on the left." (Tr. 656). Notably, as the Commissioner points out (Doc. 18, at 20), Dr. Lewis herself previously discussed the cited 2012 MRIs as showing only "mild" degenerative changes. *See* Tr. 278 ("The thoracic spine shows a small distal thoracic syrinx and mild degenerative changes, mainly at T10 and T11. The MRI of the lumbar spine without contrast [i]n 2012 shows multilevel lumbar facet arthropathy, lumbar disk bulges, and a disk protrusion causing a mild area of central spinal

stenosis."). Thus, Dr. Lewis failed to connect the dots between her opined restrictions and the reasons therefor. The ALJ could thus properly discount the opinion as not supported.

For the same reasons, Dr. Lewis's form opinion does not explain her absenteeism opinion, but rather, merely reflects a circled "[m]ore than 3xs/month" notation. (Tr. 361). And the ALJ's discussion of the record as a whole, as discussed in greater detail above, provides sufficient explanation for his rejection of such a limitation. *See, e.g., Flynn v. Comm'r of Soc. Sec.*, 2018 WL 3762721, at *9 (N.D. Ohio) (noting "[t]he ALJ implicitly rejected such a severe limitation by demonstrating the above listed medical evidence of record fails to support such an estimate"), *report and recommendation adopted*, 2018 WL 3752264; *see also Saulic v. Colvin*, 2013 WL 5234243, at *10 (N.D. Ohio) ("Here, the ALJ evaluated the medical evidence and hearing testimony, and provided sufficient explanation for his implicit rejection of Dr. Dankoff's opinion regarding Saulic's expected work absences.").

Second, the ALJ cited Plaintiff's ability to perform activities of daily living with pain medications. (Tr. 20). This implicates the consistency of Dr. Lewis's opinion with the record as a whole. *See* 20 C.F.R. § 416.927(d) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). For the reasons discussed above regarding the ALJ's subjective symptom analysis, the ALJ could properly rely on Plaintiff's self-reported activities as inconsistent with Dr. Lewis's more extreme restrictions.

The undersigned finds the reasons provided "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). Therefore, the ALJ's decision will be affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

                                         s/James R. Knepp II
                                         United States Magistrate Judge